IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

BRIDGET C. RACKLEY,

        Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,[1]

        Defendant.

No. C12-0047

RULING ON JUDICIAL REVIEW

TABLE OF CONTENTS

I.     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    *PRIOR PROCEEDINGS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   *PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      *A.*    *Administrative Hearing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
           *1.*    *Rackley's Testimony* . . . . . . . . . . . . . . . . . . . . . . . . . 5
           *2.*    *Vocational Expert's Testimony* . . . . . . . . . . . . . . . . . . 8
      *B.*    *Rackley's Medical History* . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.     *CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      *A.*    *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . . . 13
      *B.*    *Objections Raised by Claimant* . . . . . . . . . . . . . . . . . . . . . . 15
           *1.*    *Dr. Stientjes' Opinions* . . . . . . . . . . . . . . . . . . . . . . 16
           *2.*    *Dr. Mittauer's Opinions* . . . . . . . . . . . . . . . . . . . . . . 19

[1] Plaintiff originally filed this case against Michael J. Astrue, the Commissioner of Social Security Administration ("SSA"). On February 14, 2013, Carolyn W. Colvin became Commissioner of the SSA. The Court, therefore, substitutes Commissioner Colvin as the Defendant in this action. FED. R. CIV. P. 25(d)(1).

    *3.    **Hypothetical Question** .......................... 22*

**VI. CONCLUSION** ....................................... 23

**VII. ORDER** ........................................... 24

## I.  INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Bridget C. Rackley on May 17, 2012, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title XVI supplemental security income ("SSI") benefits.  Rackley asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide SSI benefits.  In the alternative, Rackley requests the Court to remand this matter for further proceedings.

## II.  PRIOR PROCEEDINGS

Rackley applied for SSI benefits on December 10, 2008.  In her application, Rackley alleged an inability to work since December 14, 1984 due to a learning disability, depression, bipolar disorder, anxiety, and schizophrenia.[2]  Rackley's application was denied on March 19, 2009.  On June 24, 2009, her application was denied on reconsideration. On August 11, 2009, Rackley requested an administrative hearing before an Administrative Law Judge ("ALJ").  On August 5, 2010, Rackley appeared via video conference with her attorney before ALJ Marilyn P. Hamilton for an administrative

---

[2] In her application, Rackley alleged that she became disabled beginning on December 14, 1984, her birth date.  However, a claimant for SSI benefits is not eligible to receive benefits until the month after the application is filed. *See* 20 C.F.R. § 416.335. Therefore, Rackley's alleged disability onset date is December 10, 2008, her application filing date.  Both parties agree that December 10, 2008 is the applicable disability onset date. *See* Rackley's Brief (docket number 10) at 1, n.1; Commissioner's Brief (docket number 11) at 3.

hearing. Rackley and vocational expert Roger F. Marquardt testified at the hearing. In a decision dated August 27, 2010, the ALJ denied Rackley's claim. The ALJ determined that Rackley was not disabled and not entitled to SSI benefits because she was functionally capable of performing work that exists in significant numbers in the national economy. Rackley appealed the ALJ's decision. On March 21, 2012, the Appeals Council denied Rackley's request for review. Consequently, the ALJ's August 27, 2010 decision was adopted as the Commissioner's final decision.

On May 17, 2012, Rackley filed this action for judicial review. The Commissioner filed an Answer on August 16, 2012. On September 17, 2012, Rackley filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing work that exists in significant numbers in the national economy. On November 15, 2012, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On November 26, 2012, Rackley filed a reply brief. On June 20, 2012, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir.

2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even

if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Administrative Hearing

#### 1. Rackley's Testimony

At the administrative hearing, the ALJ questioned Rackley about the side effects of the medication she takes for depression, anxiety, and bipolar disorder. Rackley stated that her medications cause her sleepiness. Specifically, Rackley testified that "I just sleep more than I should. I just sleep more during the day, and I go to bed late or if I get up late, I go to bed later and I just been sleeping a lot like a lot of free time I just sleep and I think that's because of my meds[.]"[3] The ALJ inquired further about Rackley's sleeping habits:

> Q: When [do] you go to bed and when do you get up now?
> A: I have a hard time sleeping at night so [my doctor has] prescribed me Trazodone to sleep so I can sleep and it seems like when I take half a pill I feel like I can't get up. I sleep a lot like was that your question was when do I go to sleep and when did I wake up? Is that's what your question?
> Q: Right.

---

[3] Administrative Record at 40-41.

A:    Mostly when I go to sleep, I go to sleep probably around 10 or 11 at night and then I sleep until like 2:00 in the afternoon the next day, and then I get up for like two hours then I go back to sleep, but there's been times that I don't go to bed [un]til like two or three o'clock in the morning.

Q:    So sometimes you stay up [un]til two in the morning and sleep [un]til two the next afternoon; like twelve hours?

A:    Yes. That sounds right.

(Administrative Record at 41.)

Next, the ALJ questioned Rackley about her drug use:

Q:    . . . Are you using any illegal drugs now?

A:    No. I'm not. I have not used any illegal drugs since March [2010].

Q:    Not since March of this year?

A:    Yes. When I had my [parental] rights terminated, I had a relapse.

Q:    When was the last time you used the drug? Well what kind of drug did you use in March? Drug or drugs?

A:    Cocaine.

Q:    How long did that last?

A:    I didn't go on a spree like I have in the past. It was a two hour deal. I couldn't take it any longer. I did it for a couple of hours and then right after that I called my sponsor and the next day, I went to a meeting. I couldn't do it very long. I was hurt so bad from my kids being taken from me, and I was really depressed and I didn't want to kill myself. I didn't want to hurt myself, I just wanted to get high so I got high for a couple of hours and then I was done. I have not used anything since March. . . .

Q:    And when was the last time you used any sort of illegal drugs before March of this year?

A:    I had two years. I had two years sober, February 17, 2008 was the day I stopped using Cocaine from the first time[.] . . .

6

Q: Well why did the court terminate your rights if you'd been clean for two years?

A: Because I had to wear a drug patch. I let my kids' father be around me who wasn't supposed to be around me who was actively using, and I got positive for having contact with him.

Q: So the court considered that you were still using even though you said you weren't.

A: Right. I actually also wanted to go see people that knew more about the patch because I didn't feel it was right. I didn't feel it was fair because I was getting positive patches and my urine samples were coming back negative, but my patches were coming back positive. Not every patch that I had was a positive patch, but you know I can't explain to the judge and everybody else that I know my addiction.
I know how I am when I'm using and if I'm going to be using drugs, I'm going to be using 24 hours nonstop. I will not stop for weeks. . . .

Q: But the basis for the termination of rights for your children that was because the court said that or their finding was that you were still using?

A: My lawyers believe me.

Q: I'm asking what the court said at the point that the rights were terminated.

A: The judge believed that I was using. I didn't come in looking like I was using. Everybody believed that I was not using. The lawyers believed I wasn't using, my counselors believed it. Everybody that came in the room said that I wasn't using.

Q: But what did the judge say?

A: The judge said she strongly believed that if the patch is positive, it's positive. That's how it is with her. She just thinks that you had to ingest it if you've got your patch and it's a positive, but my urine samples were coming back negative, my patch was coming back positive so we didn't know what was going on.

(Administrative Record at 45-48.)

Lastly, the ALJ inquired why Rackley believed she was unable to work at any job. Rackley replied that she was working 10 hours per week bussing tables at a restaurant. She had only been working at the restaurant for four days. When asked how the job was going, Rackley responded that "[i]t's really difficult for me. It's still complicated. I get really frustrated. . . . [T]hey have me learning trying to get me to learn the sandwiches and I keep messing up and so I'm not really doing too good at my job."[4]

### 2. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Roger F. Marquardt with a hypothetical for an individual who:

> has no exertional limitations, but has nonexertional limitations as follows: Is able to do only simple, routine, repetitive work involving only simple, work related decisions, few work place changes, no more than a regular pace, no production rate pace work nothing like a fast paced assembly line. There should be no contact with the public; person can be around co-workers but with only occasional conversations or interpersonal interaction. In other words doesn't require team work to get the job done and there would be only occasional supervision.

(Administrative Record at 53-54.) The vocational expert testified that under such limitations, Rackley could perform the following work: (1) deliverer (800 positions in Iowa and 96,000 positions in the nation), (2) stock checker (600 positions in Iowa and 100,000 positions in the nation), and (3) dining room attendant (3,000 positions in Iowa and 400,000 positions in the nation). The ALJ asked the vocational expert a second hypothetical question that was identical to the first hypothetical question, except it included an additional limitation that the individual "is unable to perform at a consistent pace[.]" The vocational expert stated that under such limitations, Rackley would be precluded from competitive employment.

---

[4] Administrative Record at 49-50.

8

### B. Rackley's Medical History

When she was 12, Rackley was removed from her mother's care, and placed in foster homes. From ages 14-15, Rackley lived at the Riverview Girls Group Home in Dubuque, Iowa. She was also diagnosed with oppositional defiant disorder, major depressive disorder, borderline personality disorder, and schizoaffective disorder. At age 16, she was moved to Tanager Place. In April 2002, at age 17, after running away from Tanager Place, Rackley was admitted at St. Luke's Hospital in Cedar Rapids, Iowa, with schizoaffective disorder. Doctors treated her with medication, and she was transferred to the Mental Health Institute in Independence, Iowa, where she lived until she was 18. While at the Mental Health Institute, Rackley was diagnosed with bipolar disorder, oppositional defiant disorder, post traumatic stress disorder, polysubstance abuse, and borderline intellectual functioning.[5] When she turned 18, Rackley was discharged from the Mental Health Institute, and was placed at an independent living adult program in Waterloo, Iowa. Dan Freeman, LISW, a social worker at the Mental Health Institute, opined that Rackley "is still having a fair amount of concerns in the area of emotional regulation. The prognosis would only be fair due to her ahving [sic] history of institutionalization."[6] Rackley did not complete the adult independent living program.

In May 2008, Rackley was referred to the Abbe Center for Community Health in Cedar Rapids, for treatment of her mental health problems. She met with Genevieve Nelson, ARNP, and relayed the following symptoms: anxiety, restlessness, irritability, and poor concentration. Upon examination, Nelson diagnosed Rackley with anxiety disorder and history of cocaine dependence, in early full remission in a controlled environment. Nelson also sought to rule out diagnoses for depressive disorder, bipolar

---

[5] Rackley's full scale IQ was 74, from an intelligence test taken in April 2001.

[6] Administrative Record at 294.

affective disorder, and borderline personality disorder. Nelson concluded that Rackley "appears motivated for treatment and is appropriate to be followed for medical management of anxiety and mood disturbances."[7] Nelson prescribed medication as treatment.

On February 17, 2009, Rackley was referred to Dr. Harlan J. Stientjes, Ph.D., for a psychological evaluation. In reviewing Rackley's background, Dr. Stientjes noted that:

> [Rackley] claimed that she had a very difficult childhood with a mother that regularly used drugs. She was in and out of foster placement for years. Sexual molestation occurred early and often by many different men during her childhood. She reportedly always had difficulty with learning in school but also changed schools often and had many behavior problems. She dropped out of school in the senior year and has not at this time completed her GED. There is marginal, if any, history of employment.

(Administrative Record at 378.) Dr. Stientjes administered an intelligence test to Rackley, and her full scale IQ score was 75. Upon examination, Dr. Stientjes diagnosed Rackley with ADHD, major depressive disorder, and borderline general ability. Dr. Stientjes opined that Rackley:

> can understand and remember simple oral and written instructions. She can master simple routines but easily becomes bored and frustrated. Carryover from one day to the next requires reminders and prompts. Interaction with other[s] tend to be somewhat volatile. . . . Safety judgment is questionable and response to workplace changes will require initial acclimation to typical demands of a work environment.

(Administrative Record at 380.) Dr. Stientjes concluded that:

> [Rackley] is a 24-year-old mother of one child and expecting a second. Her daughter has been removed from her care secondary to a failed drug screen. [Rackley] had a

---

[7] *Id.* at 373.

> dysfunctional childhood, was identified ADHD, and placed in
> foster care. She has not completed high school or attained a
> GED, although that is a current recommendation of DHS.
> Currently she has mild depressive symptoms, but benefits from
> anti-depressant medication. General cognitive ability was
> found to be in the borderline range, with consistent adaptive
> behavior. She remains highly impulsive and inattentive, but
> may be making slow progress toward attainment of functional
> life skills.

(Administrative Record at 381.)

On March 10, 2009, Dr. Beverly Westra, Ph.D., reviewed Rackley's medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment for Rackley. On the Psychiatric Review Technique assessment, Dr. Westra diagnosed Rackley with ADHD and major depressive disorder. Dr. Westra determined that Rackley had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Westra determined that Rackley was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. Dr. Westra concluded that:

> [Rackley] is capable of learning and performing simple,
> routine tasks with regular supervision in settings that do not

11

require intense concentration or frequent interpersonal contact. She will be less reliable during times of high stress. Allegations are partly supported. There is no support found for allegations of schizophrenia or bipolar, however.

(Administrative Record at 391.)

On June 21, 2010, at the request of Rackley's attorney, Dr. Mark Mittauer, M.D., a treating source, filled out a Mental Impairment Questionnaire for Rackley.[8] Dr. Mittauer diagnosed Rackley with generalized anxiety disorder and bipolar disorder. Dr. Mittauer noted that on her most recent visit, on June 9, 2010, Rackley had suicidal thoughts, auditory and visual hallucinations, and a depressed mood. Dr. Mittauer listed her prognosis as "fair to recently poor." Dr. Mittauer identified the following symptoms for Rackley: loss of interest in most activities, decreased energy, thoughts of suicide, feelings of guilt or worthlessness, generalized anxiety, mood disturbance, difficulty thinking and concentrating, persistent disturbances of mood or affect, recurrent obsessions or compulsions which are a source of marked distress, bipolar syndrome manifested by both manic and depressive syndromes, hallucinations or delusions, manic syndrome, illogical thinking, sleep disturbance, and recurrent severe panic attacks. Dr. Mittauer opined that Rackley is seriously limited, but not precluded from the ability to: remember work-like procedures and respond appropriately to criticism from supervisors. Dr. Mittauer also opined that Rackley is unable to meet competitive standards in the ability to: maintain attention for a two-hour segment, deal with normal work stress, and carry out detailed instructions. Lastly, Dr. Mittauer opined that Rackley had no useful ability in the areas of: completing a normal workday or workweek without interruptions from

_____

[8] According to the questionnaire, Dr. Mittauer met with Rackley "every 2 weeks or so" since May 6, 2008. *See* Administrative Record at 452. However, in reviewing the entire record, it appears that Dr. Mittauer started treating Rackley in September 2009, and before that time she was treated by other doctors and a nurse practitioner at Dr. Mittauer's place of employment, the Abbe Center for Mental Health.

psychologically based symptoms, understanding and remembering detailed instructions, dealing with stress of semi-skilled and skilled work, and traveling in unfamiliar places. In Dr. Mittauer's opinion, Rackley did not have a low IQ or reduced intellectual functioning. Dr. Mittauer determined that Rackley had the following limitations: marked restriction of activities of daily living, mild difficulties in maintaining social functioning, and extreme difficulties in maintaining concentration, persistence, or pace. Lastly, Dr. Mittauer opined that Rackley would miss more than four days per month from work due to her impairments or treatment for her impairments.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Rackley is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v.*

*Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting
*Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful
> activity. If so, the claimant is not disabled. Second, the ALJ
> determines whether the claimant has a severe medical
> impairment that has lasted, or is expected to last, at least
> 12 months. Third, the ALJ considers the severity of the
> impairment, specifically whether it meets or equals one of the
> listed impairments. If the ALJ finds a severe impairment that
> meets the duration requirement, and meets or equals a listed
> impairment, then the claimant is disabled. However, the
> fourth step asks whether the claimant has the residual
> functional capacity to do past relevant work. If so, the
> claimant is not disabled. Fifth, the ALJ determines whether
> the claimant can perform other jobs in the economy. If so, the
> claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant
"bears the burden of demonstrating an inability to return to [his] or her past relevant
work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*,
524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden
shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC
[(residual functional capacity)], age, education, and work experience, there [are] a
significant number of other jobs in the national economy that [the claimant] could
perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir.
2005)). The RFC is the most an individual can do despite the combined effect of all of his
or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for
determining "'a claimant's RFC based on all the relevant evidence including the medical
records, observations of treating physicians and others, and an individual's own description

of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 416.945.

The ALJ applied the first step of the analysis and determined that Rackley had not engaged in substantial gainful activity since December 10, 2008. At the second step, the ALJ concluded from the medical evidence that Rackley had the following severe impairments: borderline intellectual functioning, bipolar disorder, ADHD, generalized anxiety disorder, and history of substance abuse. At the third step, the ALJ found that Rackley did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Rackley' RFC as follows:

> [Rackley] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: [Rackley] is able to perform only simple, routine, repetitive work involving only simple work-related decisions with few work place changes, at no more than a regular pace (i.e., no production-rate pacework such as a fast paced assembly line). There should be no contact with the public. [Rackley] can be around co-workers, but with only occasional conversations or interpersonal interaction. There should be only occasional supervision.

(Administrative Record at 14.) Also at the fourth step, the ALJ determined that Rackley had no past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Rackley could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Rackley was not disabled.

### B. Objections Raised by Claimant

Rackley argues that the ALJ erred in three respects. First, Rackley argues that the ALJ failed to properly evaluate the opinions of her consultative examiner, Dr. Stientjes. Second, Rackley argues that the ALJ failed to properly evaluate the opinions of her

treating physician, Dr. Mittauer. Lastly, Rackley argues that the ALJ failed to properly assess her education level, which in turn, caused the ALJ's ultimate disability determination to be flawed because the ALJ provided improper hypothetical questions to the vocational expert.

### 1. Dr. Stientjes' Opinions

Rackley argues that the ALJ failed to properly evaluate the opinions of Dr. Stientjes, a consultative examining doctor. Specifically, Rackley maintains that the ALJ failed to include all the limitations imposed by Dr. Stientjes in her RFC assessment for Rackley. As a result of not including all of Dr. Stientjes' limitations in her RFC assessment, Rackley contends that the ALJ's RFC assessment is not supported by substantial evidence in the medical record as a whole. Rackley concludes that this matter should be remanded so that the ALJ can more fully and fairly develop the record with regard to Dr. Stientjes' opinions, and fully consider those opinions in her RFC determination.

An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion is not from a treating source, then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese v. Astrue*, 552 F.3d 728, 731 (8th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

16

Furthermore, an ALJ also has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

Additionally, an ALJ has the responsibility of assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). However, "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guilliams*, 393 F.3d at 803 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

In her decision, the ALJ thoroughly addressed Dr. Stientjes' opinions as follows:

> At the request of Disability Determination Services, [Rackley] was examined by licensed psychologist Harlan J. Stientjes, Ph.D., on February 17, 2009. . . . Mental status examination revealed good eye contact, high energy and impulsivity, and rapid speech. Valid results of the Wechsler Adult Intelligence Scale-IV revealed a verbal comprehension index of 72, perceptual reasoning index of 84, working memory index of

74, processing speed index of 75, and full scale IQ of 75. Diagnoses included attention deficit hyperactivity disorder, major depressive disorder, borderline general intellectual ability; and a GAF rated as 61. The psychologist indicated [Rackley] experienced mild depressive symptoms with benefit from medication. He opined [Rackley] was capable of understanding and remembering simple instructions and mastering simple tasks and routines; however, she may experience volatile interactions with others as well as boredom and frustration.

(Administrative Record at 16.) In weighing Dr. Stientjes' opinions, the ALJ determined that:

Significant weight is accorded to the opinion of the consultative examiner as the opinion is consistent with his own objective findings, and with other substantial evidence in the record as a whole.

(Administrative Record at 19.) Additionally, the ALJ found that:

In sum, no one doubts [Rackley] experiences some limitation. However, the above residual functional capacity assessment is supported by the objective medical evidence, the medical opinions when afforded appropriate weight, and [Rackley's] rather diverse activities and her subjective complaints during the relevant period when taken in proper context. In view of all the facts discussed above, the quite restrictive limitations on [Rackley's] capacities which were described earlier in this decision are considered warranted, but no greater or additional limitations are justified.

(Administrative Record at 19.)

Here, the ALJ thoroughly reviewed Rackley's medical records and fully considered the opinions of treating and consultative sources.[9] Specifically, the ALJ addressed Dr. Stientjes' opinions and determined that "significant" weight should be accorded to his

_____

[9] *See* Administrative Record at 15-19.

opinions.[10]   Furthermore, the ALJ incorporated some of Dr. Stientjes' opinions in her RFC assessment for Rackley, including Rackley's functional capabilities with regard to understanding, remembering, and interacting with others.[11]   Accordingly, the Court concludes that the ALJ properly weighed the opinions of Dr. Stientjes. *See Wiese*, 552 F.3d at 731. Moreover, while the ALJ may not have incorporated all of the limitations opined by Dr. Stientjes, the Court nevertheless finds that the ALJ properly considered Dr. Stientjes' opinions and addressed them in her decision. *See Wagner*, 499 F.3d at 848.

Additionally, having reviewed the entire record, the Court finds that the ALJ properly considered Rackley's medical records, observations of treating physicians, and Rackley's own description of her limitations in making the RFC assessment for Rackley.[12] *See Lacroix*, 465 F.3d at 887. Furthermore, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618. Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618.

## 2.     *Dr. Mittauer's Opinions*

Rackley argues that the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Mittauer.   Specifically, Rackley argues that the ALJ's reasons for discounting Dr. Mittauer's opinions are not supported by substantial evidence on the record. Rackley concludes that this matter should be remanded for further consideration of Dr. Mittauer's opinions.

---

[10] *Id.* at 19.

[11] *See* Administrative Record at 16.

[12] *Id.* at 14-19.

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided

by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

In her decision, the ALJ discussed Dr. Mittauer's opinions:

> The undersigned considered the medical source statement of Dr. Mittauer; however, little weight is given to this because the significant limitations indicated by the treating psychiatrist are not supported by his own global assessment of functioning ratings over time, nor by his objective findings on mental status examinations over time. Also, Dr. Mittauer's medical source statement is inconsistent with other substantial medical and nonmedical evidence in the record. Greater weight is accorded to Dr. Mittauer's contemporaneous longitudinal medical treatment records and their concomitant GAF assessments, which show an initial low GAF of 45 which quickly improved (within a month of beginning treatment, once compliant on appropriate medications) to GAFs in the range of 60-62, and thereafter remained in the 60-62 range. . . . While the GAF is but a 'snapshot' assessment of overall functioning, the longitudinal assessments over time are considered as one part of the evidence. Thus, Dr. Mittauer's contemporaneous assessments of [Rackley's] mental status ranged from high moderate, with some difficulty in social, occupational, or school functioning, to mild symptoms, generally functioning pretty well. This is inconsistent with his medical source statement, but consistent with the residual functional capacity above.

(Administrative Record at 18-19.) Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Mittauer. The Court also finds that the ALJ provided "good reasons" for rejecting Dr. Mittauer's opinions.[13] *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*,

---

[13] Rackley points out that the ALJ's attribution and emphasis on her GAF scores
(continued...)

314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 3. *Hypothetical Question*

Rackley argues that the ALJ's hypothetical question to the vocational expert was insufficient to account for her education level. Specifically, Rackley argues that even though the ALJ pointed out to the vocational expert that Rackley did not graduate from high school or earn a GED, the ALJ should have further explained to the vocational expert that she had borderline intellectual functioning. Rackley maintains that this matter should be remanded so that the ALJ may ask a proper hypothetical question to the vocational expert.

Hypothetical questions posed to a vocational expert, including a claimant's RFC, must set forth his or her physical and mental impairments. *Goff*, 421 F.3d at 794. "The hypothetical question must capture the concrete consequences of the claimant's

---

[13](...continued)
in the 60-62 range to Dr. Mittauer is only partially correct. Specifically, Rackley argues that "the Commissioner relies on one GAF score to counter Dr. Mittauer's treatment history and interpretation of his own GAF score." Rackley's Reply Brief (docket number 12) at 3. A review of the record reveals that Dr. Mittauer initially assessed Rackley with a GAF score of 45, but then assessed scores of 62 and 52. Additionally, two non-medical sources at the Abbe Center, where Dr. Mittauer also worked, assessed Rackley with a GAF score of 60 on two separate occasions. Furthermore, an Abbe Center psychological nurse practitioner who treated Rackley for more than one year prior to Dr. Mittauer, assessed Rackley with a GAF score of 55 on 10 separate occasions between May 2008 and August 2009. Additionally, in February 2009, Dr. Stientjes, an examining source, assessed Rackley with a GAF score of 61. Thus, between 2008 and 2010, Rackley's GAF scores generally ranged from 55-62, with one score of 45. Therefore, even though the ALJ could have explained herself better, the Court nevertheless believes that ALJ's GAF score analysis in her decision is supported by substantial evidence in the record as a whole. *See Anderson*, 696 F.3d at 793.

deficiencies." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (citing *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997)). The ALJ is required to include only those impairments which are substantially supported by the record as a whole. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001); *see also Haggard v. Apfel*, 201 F.3d 591, 595 (8th Cir. 1999) ("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.' *See Davis v. Shalala*, 31 F.3d 753, 755 (8th Cir. 1994) (quoting *Roberts v. Heckler*, 783 F.2d 110, 112 (8th Cir. 1985).").

Having reviewed the entire record, the Court finds that the ALJ thoroughly considered and discussed both the medical evidence and Rackley's testimony in determining Rackley's impairments.[14] The Court further determines that the ALJ's findings and conclusions are supported by substantial evidence on the record as a whole, including her consideration of Rackley's intellectual functioning.[15] Because the hypothetical question posed to the vocational expert by the ALJ was based on the ALJ's findings and conclusions, the Court concludes that the ALJ's hypothetical question properly included those impairments which were substantially supported by the record as a whole. *See Goose*, 238 F.3d at 985; *see also Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004) (an ALJ need only include those work-related limitations that he or she finds credible). Therefore, the ALJ's hypothetical question was not insufficient.

## *VI. CONCLUSION*

The Court finds that the ALJ properly considered the medical evidence and opinions in the record, including the opinions of Dr. Stientjes and Dr. Mittauer. Additionally, the

---

[14] *See* Administrative Record at 15-19.

[15] Specifically, in her hypothetical questions to the vocational expert, the ALJ correctly stated that Rackley dropped out of school in the eleventh grade, did not earn a GED, and was limited to "only simple, routine, repetitive work involving only simple, work related decisions[.]" Administrative Record at 53.

ALJ's hypothetical questions to the vocational expert properly included those impairments which were substantially supported by the record as a whole. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1.    The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.    Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and

3.    The Clerk of Court is directed to enter judgment accordingly.

DATED this ___8th___ day of March, 2013.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA